HENRY WALDRON ET AL., EXECUTORS OF WILLIAM WALDRON v. PERMELIA MURPHY, LUANA MURPHY, JOHN H. ARMSTRONG, ANDREW ASHBAUGH AND LUCINDA VAN AKIN.

*Lien not discharged if refusal of tender is reasonable.*

There is no equity in seeking to avoid both lien and debt.

If the refusal to accept a tender is not absolute or unreasonable, it does not necessarily discharge a security.

A tender made without notice at an unfit place may be properly declined until the creditor can have reasonable time to examine the account.

There can be no waiver without knowledge of the defect waived.

A tender, partly in bank notes, was abruptly made upon the street to the owner of some overdue mortgages, who was known to be sick and nearly blind, and who declined to transact the business until the next morning. The next morning he offered to receive the money, but reliance was then had on the tender, and it was not paid. *Held* that the tender did not discharge the lien of the mortgage, and being in bank notes could not be insisted on if rejected for that reason.

Equity will not aid an unconscientious technical defense beyond the precise limit of defendant's right.

Appeal from Hillsdale. Submitted April 16. Decided April 24.

FORECLOSURES. Defendant Ashbaugh appeals.

*E. J. March* and *E. L. Koon* for complainants.

*M. B. Koon, A. Dickerman* and *A. E. Chadwick* for defendant Ashbaugh.

CAMPBELL, C. J.    Two causes between the same parties and depending on the same state of facts have been argued together and the same decision will cover them both.

Both bills are filed to foreclose mortgages on the same property, made by defendants Permelia and Luana Murphy (in which one Reuben A. Murphy joined).    One was dated December 22, 1869, for $700, payable to David Emery in three years with annual interest at 10 per cent. The other was dated April 7, 1870, given to Benjamin F. Murphy for $1,400, payable in two years with interest at 10 per cent.    The first through intermediate assignment became the property of William Waldron December 27, 1876.    The other was assigned to him very soon after its date.

The defendant Andrew Ashbaugh went into possession of the land in 1872 and owns it.    From time to time and irregularly he continued to make payments of interest, and the principal was left uncollected on both mortgages.    The last interest paid on the $700 mortgage was before its assignment to Waldron, so far as appears by the endorsements.    Interest was paid on the $1,400 to April, 1876, but paid in June, 1876.

In the early part of 1877 Mr. Waldron's health failed so badly that he was obliged to be under medical treatment, and lost his sight to a considerable extent so as not to be able to see clearly.    He spent some time under advice in New York, and did not return home until after noon on the 11th of May.    He kept his mortgages and other securities in the bank of which he was president in Hillsdale, of which Mr. Stewart was cashier, and did not during his absence that spring leave authority with any one to receive payment on them.    Mr. Ashbaugh,

through his son, applied during his absence to pay interest on the small mortgage, but Mr. Stewart did not receive it and desired him to await Mr. Waldron's return. Mr. Stewart is claimed, although the testimony is not very satisfactory on that point, to have been requested to inform Mr. Waldron that Ashbaugh wanted to pay up the mortgages. Waldron was never so informed, and had no knowledge of that purpose until the day of his return.

Defendants claim the mortgage lien was discharged by a tender made on that day and refused. The whole case turns on the effect of that tender. Mr. Waldron died without testifying, and the whole facts depend on other evidence. The tender made is testified to by Zina Ashbaugh and Mr. St. John, an attorney residing in Hillsdale.

On the 11th of May Andrew Ashbaugh obtained a loan from John Armstrong which it was desired to make a first security, which could only be done by getting the Waldron mortgages discharged. On applying at the bank it was learned Mr. Waldron was expected back in the afternoon. Zina Ashbaugh and St. John called at the bank in the afternoon, and learned that Mr. Waldron was at home, about forty rods distant. They provided themselves with what was figured up as the proper sum and a few cents over, in mixed funds and went up to find him. They first requested and obtained the promise of the cashier to keep the bank open after closing time, which was near, in case Mr. Waldron would not accept the money, in which event they said they did not want to carry so much money about them during the night.

They met Mr. Waldron in the street not far from his house, going with a sister to visit a neighbor. The witnesses do not agree precisely on what took place, but in most respects concur. St. John somewhat abruptly referred to the two mortgages held by Mr. Waldron and told him there was the money to pay them. Mr. Waldron intimated that he might take it on one of the mort-

gages, but that he had told Mr. Ashbaugh, the owner of the land, that the other might run if he wanted it to. On the tender being pressed he objected that his house was not the place where he did business and that he did it at the bank. He said he could not see to count money in the street. On their proposing to go to the bank he objected it was past bank hours and it would be closed. They told him Stewart had agreed to keep the bank open, and Mr. St. John asked him "will you take the money?" and he refused, and said he would be at the bank in the morning, and if they had any business with him he would attend to it then.

They then returned and made a tender to Stewart, and on his declining for want of authority, deposited the money, not in his bank but in another bank, to the credit of Mr. Armstrong, but designated as Ashbaugh money.

The next morning Mr. Waldron sent for and had an interview with St. John and offered to receive the money, but it was never paid, and the parties saw fit to rely on their tender.

It has been held in this state that a willful and absolute refusal to accept a lawful tender discharges a lien. But there is no equity in attempting to avoid both lien and debt, and the security should not be discharged by any action in which the conduct of the creditor is not unjustifiable. If the refusal of a tender is not unreasonable or absolute, we do not think a mortgage is cut off by it. For the cases heretofore decided bearing on this question see *Caruthers v. Humphrey*, 12 Mich., 270; *Van Husan v. Kanouse*, 13 Mich., 303; *Eslow v. Mitchell*, 26 Mich., 500; *Potts v. Plaisted*, 30 Mich., 149; *Flanders v. Chamberlain*, 24 Mich., 305; *Cowles v. Marble*, 37 Mich., 158; *Collar v. Harrison*, 28 Mich., 518: 30 Mich., 66; *Barnard v. Harrison*, 30 Mich., 8; *Sager v. Tupper*, 35 Mich., 134; *Fry v. Russell*, 35 Mich., 229.

In the present case, upon a review of the facts, we

think the tender was not made under circumstances entitling it to be enforced in this way, if at all. Mr. Ashbaugh, who represented his father, does not appear to have given St. John any improper instructions or to have meditated any sharp dealing. But the conduct of St. John, if it had succeeded, would have had the practical effect of very sharp practice. He knew Mr. Waldron's bodily infirmity, and both he and Ashbaugh evidently contemplated that Waldron might not accept the money. He knew that the mortgages were not in Waldron's personal possession, and that it would be unreasonable to expect him to close any redemption without a personal examination or one made for him. In such a case a man who is perfectly well—and far more a man both sick and nearly blind—cannot be held to have unreasonably refused a tender, if he merely desires a reasonable time and a reasonable place to determine his conduct. The drawee of a draft has twenty-four hours to determine whether or not to accept it, and such a delay as Waldron asked here was entirely proper, and such as an honest debtor should not have complained of.

The previous delays in payment of interest, and the previous mutual dealings between the parties would of themselves have justified deliberation and made it unfair to compel Waldron under any circumstances to hasty decision. Neither witness testifies to any such explanation as would call on him to use any haste in the matter. He was not told of the Armstrong loan or its conditions. He was abruptly and unreasonably urged to decision when he was physically unable to protect himself, and when the course asked of him was unbusinesslike and unseemly, without some explanation, which there was no attempt to give. We think he understood the whole matter was postponed until the next day. If so, there was no refusal at all. Whether he understood so or not, the postponement was, if made in good faith, as we think it clearly was, no more than was proper and reasonable.

It is, moreover, although we do not care to make it the basis of our decision, very clear that no tender was made at all which called for any action whatever, in order to save Waldron's rights. The money taken to him was not a legal tender,—a part of it being in bank-notes. He probably would not have rejected it on this ground, but he had a right to do so, and St. John and Ashbaugh, intending to get an advantage by their tender, were bound to comply with the law. He could waive nothing without knowledge, and he was not informed and could not tell for himself what sort of funds they brought. Parties desiring the aid of courts to protect them in an unconscientious defense must make it out in the strictest manner. No court of equity will aid them in such transactions beyond the precise line which measures their rights.

We have not thought it necessary to refer to some other defects in the defense. We think the court below properly overruled it; and the decree must be affirmed with costs against appellant.

The other Justices concurred.